This litigation arose out of the following facts:
In 1966, Mr. Milton Andrews, his son Bruce Andrews and Mr. Denson Hinton formed a corporation called Charter Corporation. John Andrews, another son of Mr. Milton Andrews, went to work with that company about the time it was formed. The business of the corporation was developing land, building and selling houses to the public.
Charter Corporation was sold to Electronics Capital Corporation in August, 1969. The name was ultimately changed to Shelter Resources. After Shelter Resources acquired Charter Corporation, Mr. Milton Andrews stayed on as chairman of the board, Bruce Andrews stayed on as president, and John stayed on and was in charge of building a manufacturing plant for the production of modular homes for Shelter Resources in Double Springs, Alabama. John Andrews was, according to Mr. K.L. Jones, who was employed by the corporation in November, 1969, vice-president of the corporation and general manager of the production facility of the company.
The corporation (the names "Charter Corporation" and "Shelter Resources" are used interchangeably in the record, both sides agreeing that they are the same, except for a difference in name) entered into a contract with a corporation called "Jasco, Inc." on December 30, 1969, whereby Charter Corporation agreed to buy certain lots in Walker County from Jasco, all of the lots being in a subdivision known as Edgewood Subdivision, Sector 2. Charter was to pay for these lots in phases as it developed them. Jasco agreed with Charter to furnish, at the closing of each group of lots, a certificate of satisfactory percolation tests approved by the Walker County Health Department for the installation of individual sewage disposal systems.
By letter dated December 18, 1969, Jasco, Inc. also agreed with Charter Corporation to place ". . . a double surface bituminous street according to specifications of Walker County, Alabama, throughout the dedicated streets of the subdivision. Further, we are to bring a main water line of a minimum size of 2 1/2 inches to the point of beginning of the first lot nearest the old Bankhead Highway."
This letter indicated that Jasco was "handing" Charter percolation test information indicating approval of the Walker County Health Department of the property for the installation of septic tanks.
Shortly after signing the agreement with Jasco, Charter started building on these lots. K.L. Jones, employed by Charter until December, 1970, testified that Charter built on five to ten of the lots acquired from Jasco. It was also his testimony that, after building two houses, he was either notified in writing or received a call from the county sanitation officer indicating that:
 ". . . [T]here might be some problem there and we had better hold up and not go so fast with the construction because it looked like we were saturating the ground with septic tanks much more rapidly than they had thought we were going to do. And that before we started any additional construction we had better talk to them and take a look and see just where we were going to go and be sure that we didn't get into a saturated area. I can't actually say they said no this won't perc now because they had already approved the lots."
Jones also testified that, while he was employed by Charter, he was in charge of various subdivisions being developed by the corporation, some forty of them, and John Andrews was in charge of the manufacturing *Page 1336 
plant. He testified that John Andrews was not active in the development of the lots, but it was necessary for the two of them to stay in touch because ". . . [H]e [John] was constituting the various lots where we wanted them to be placed. So, it was necessary we maintain contact."
John Andrews testified that he worked for Charter Corporation (after its acquisition in August of 1969 by Shelter Resources) for about a year, or ". . . It may have been a little more than a year . . ."
Jones testified that he left the company in December, 1970, and John left before he did.
By late summer or early fall of 1970, the corporation was financially distressed, by all accounts. A Mr. Quindlen came to Birmingham from New York (Shelter Resources was headquartered there at that time) and started liquidating assets of the corporation. Bruce Andrews testified that the corporation had assets, but it also had enormous accounts payable. At about this time, John Andrews approached K.L. Jones, who was still with the company, and asked to see what lots the corporation had to sell. His father was still chairman of the board; and his brother was still president of the corporation at the time John resigned; but the record does not disclose just when John left. It was his testimony that he ". . . just phased out" after a year or more. It was John's idea to buy the lots and build houses on them. He formed a corporation called "Cardinal Enterprises, Inc." for this purpose. He first bought five lots and built houses and sold them. He then entered into the following contract with Charter Corporation to buy twenty more lots:
"November 20, 1970
 "Mr. R.V. Quindlen, Vice President Charter Corporation 1130 Bank for Savings Building Birmingham, Alabama 35203
"Dear Mr. Quindlen:
 "The purpose of this letter is to outline our position with reference to the proposed acquisition from Charter Corporation of 20 lots in the second Sector of Edgewood Subdivision.
 "We propose to buy these lots for a consideration of $37,000.00, Thirty Thousand of which we have already paid to Charter Corporation. We hereby agree to pay the remaining $7,000, without interest at the rate of $350 per lot, payable at the time the [The words "permanent loans are closed and the proceeds received by us" were marked out and the following underlined words were substituted:] units are set. JMA RVQ It is our intention to liquidate this obligation within 120 days from the date hereof, but it is further understood and agreed that any lots remaining unused by Cardinal Enterprises, Inc. at the expiration of 120 days will, at the option of Cardinal Enterprises, be re-purchased by Charter Corporation at a price of $1950.00 per lot. Any portion of the above mentioned $7,000 which has not been liquidated will be credited against the re-purchase price at the rate of $350 per lot.
 "[The following underlined words were added at the beginning of this paragraph:] Any lot repurchased could be paid for at Cardinal's cost in purchase + $100 RVQ 11/20/70 It is further understood and agreed that all the terms and conditions and guaranties warranted to Charter Corporation by JASCO, INC., are hereby warranted to Cardinal Enterprises, Inc. by Charter Corporation. To indicate that you understand and are in accord with this agreement, please so indicate by signing the enclosed carbon copy of this letter and at the same time executing to Cardinal Enterprises, Inc. a deed with appropriate title covering the 20 lots involved.
"Yours very truly,
"/s/ John M. Andrews
 "John M. Andrews, President CARDINAL ENTERPRISES, INC.
"CHARTER CORPORATION
"By /s/ R.V. Quindlen 11/20/70
 R.V. Quindlen, Vice President" *Page 1337 
John Andrews borrowed $30,000 of the purchase price of these twenty lots and was to pay the other $7,000 at the rate of $350 per lot as modular units were set on them. It normally took him one month from start to finish to complete a modular home, including grading the lot, putting in the foundation, setting the house on the foundation, and landscaping. The 120 days mentioned in the contract was the period of time it would take him to see whether his program would be successful. At the end of that time, at his option, he could call on Shelter Modular to buy back any unused lots.
After executing this agreement, John built houses on seven of the twenty lots and sold them. He then started getting complaints from the people who bought the houses, complaining of problems with the septic tanks. He tried to remedy the problem, but could not. He made a profit of $12,742.05 on the lots he sold. After the problems started, he stopped building on the other lots. He testified that, when he signed the agreement to buy the lots the subdivision was approved by the U.S. Government for "235" program financing. The Government failed to renew that program for this subdivision in the summer of 1971.
In June, 1971, the record shows a letter addressed to Shelter from Cardinal, enclosing a check in the amount of $7,873.78, which, according to Cardinal, represented the balance of the account to Shelter on the lots to date. This letter also said:
 ". . . Although we acknowledge the debt of $4,200.00, we intend to pay it in accordance with the terms in the attached letter."
The contract letter of November 20, 1970, was attached.
In August, 1971, Mr. Andrews had an engineer run percolation tests on the remaining thirteen lots. This test showed that seven of the lots did not percolate and six of them did. Approval for the installation of septic tanks by the Walker County Department of Health was never withdrawn. However, no further building was done after the summer of 1971 on any of the remaining thirteen lots.
Thereafter, on February 22, 1972, Cardinal called upon Shelter Modular to repurchase the thirteen unused lots at a price of $1950 per lot, saying by letter "Cardinal Enterprises, Inc. hereby exercises its option to have these lots repurchased by your company."
Suit was filed in November, 1972, seeking damages for breach of contract alleging failure on Shelter's part to put roads in as agreed, damages for failure to repurchase the lots in accordance with the agreement, and a third claim for misrepresentation. As to the third claim, it was Cardinal's contention that Shelter knew that the lots would not percolate and failed to reveal that information when it sold the lots.
The case was tried and submitted to the jury on all three claims. It returned a general verdict in favor of Cardinal in the amount of $75,000. Shelter Modular appealed.
Although the appellant raises a number of issues for review, it most strongly asserts that there was no evidence produced by the plaintiff below which made out a jury question on the issue of fraud. We have carefully read the full record in this case. Without elaboration, we are satisfied that there was evidence from which the jury could have found that the appellant breached the contract sued on. However, we agree with the appellant that the plaintiff failed to carry its burden of proof on the fraud claim. In its complaint, the plaintiff alleged that the defendant represented to it that the lots were acceptable for construction of residential housing and septic tanks could be installed on each of the individual lots. It averred that this representation was false and that the defendant knew that this was false, or without knowledge of the facts, recklessly misrepresented them. Plaintiff believed the representations and, in reliance upon them, purchased the property.
The only proof the plaintiff offered, to support its allegation that the defendant knew that the lots would not percolate, was *Page 1338 
the testimony of K.L. Jones who testified that, while he was still in the employ of the corporation, he received a call from someone with the Walker County Health Department indicating that there was a saturation problem in the subdivision. His testimony in this regard is set out in its entirety above.
In its oral charge to the jury, the trial court correctly stated the law with regard to the plaintiff's burden of proof on the fraud claim. The charge stated:
 ". . . The defense places the burden on the Plaintiff to reasonably satisfy you from the evidence in the case that the Defendant knew or should have known that the soil of the property sold to the Plaintiff by the Defendant would not be acceptable for the construction of residential housing and installation of septic tanks. And that these facts are concealed from the Plaintiff, and the Plaintiff had no knowledge of such facts."
Assuming that the call which Mr. Jones said he received from the Walker County Health Department is sufficient to indicate that the lots would not percolate, every indication from the record is that this information was received by the company while John Andrews was a vice-president thereof. Although the record is silent as to the date this information was received, Jones said it came after the corporation had built two houses on lots in this subdivision. It built a total of five to ten, according to him. It would appear very unlikely that this information was received in the short period after John left the company, of which he was a vice-president and before he agreed to buy the lots.
This court has, as most others, repeatedly held that a corporation cannot escape liability in fraud cases by showing that the agent through whom it acted was without knowledge of the true facts. The issue in those cases is whether the corporation had knowledge of the true facts. J. Truett PayneCo. v. Jackson, 281 Ala. 426, 203 So.2d 443 (1967); Bolton Fordof Mobile, Inc. v. Little, Ala., 344 So.2d 1208 (April 22, 1977).
In fact, it is that principle of law which the plaintiff relied upon below in correctly asserting that it was immaterial whether Mr. Quindlen, who acted for the corporation in selling the lots, knew that the corporation had received information that the lots might not be suitable for septic tank installation. However, the converse of that rule is applicable here. The record indicates, although there is no specific evidence either way, that Mr. Andrews was probably still a vice-president of the corporation when it received information which could be treated as sufficient to indicate that the lots would not percolate. As a vice-president of the corporation, he, of course, was an agent thereof. This state has codified the common law at Title 9, § 72, Code.
 "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."
This statute does no more than restate the common law rule imputing to both principal and agent "whatever either has notice of." Under that long established rule, John Andrews, as vice-president of Shelter Modular, is deemed to have notice of whatever his principal had notice of, if such information was received while the agency relationship existed. That, of course, is a question for the jury to determine.
We are in complete agreement with the appellee that a fraud claim may be maintained where a party who knows material facts is under a duty to disclose that information, and fails to do so. We further agree that there are times when the law imposes a duty to disclose facts within a party's knowledge.Metropolitan Life Ins. Co. v. James, 228 Ala. 383, 153 So. 759
(1934). But, the purpose of these rules is to place the parties upon an equal footing, so that each may have the benefit of all material information. 37 Am.Jur.2d, Fraud and Deceit, § 146. *Page 1339 
In the instant case, the plaintiff had the burden of proving that the defendant knew, or should have known, that the lots were unacceptable for the construction of houses, that it concealed this fact from the plaintiff, and that the plaintiff had no knowledge of these facts. Under the circumstances presented here, this would require the plaintiff to show that the defendant corporation acquired this information at a time when the plaintiff was no longer a vice-president of the corporation. This, the plaintiff did not do. The fact that John Andrews formed a corporation for the purpose of building houses on the lots acquired from Shelter is of no consequence. It is not controverted that Cardinal Enterprises, Inc. is John Andrews.
The trial court correctly submitted the contract claims to the jury. The defendant, however, was entitled to a directed verdict on the fraud claim, since the plaintiff failed to prove one of the elements of that claim. The jury rendered a general verdict and it is not possible to determine what amount related to the three claims submitted to it. It is, therefore, necessary to reverse and remand the cause for a new trial. If, on a new trial, the plaintiff is able to produce evidence from which the jury can determine when the information made the basis of the fraud claim was acquired by the corporation, and that it was acquired after the agency relationship between Shelter and Andrews was terminated, it would then be proper to allow the jury to pass on that claim.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, FAULKNER and BEATTY, JJ., concur.