[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/23/98
THOMAS  K. KAHN
CLERK

No. 95-6234

D.C. Docket No. CV 92-G-1614-S

CITY OF TUSCALOOSA; MUNICIPAL UTILITIES
BOARD OF ALBERTVILLE; et al.,

Plaintiffs-Appellants,

AUBURN WATER WORKS BOARD; JASPER
WATER WORKS AND SEWER BOARD, INC., et al.,

Plaintiffs-Intervenors-Appellants,

versus

HARCROS CHEMICALS, INC.; JONES
CHEMICALS, INC.,et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Alabama

**(October 23, 1998)**

Before TJOFLAT and COX, Circuit Judges, and WELLFORD*, Senior Circuit Judge.

*Honorable Harry W. Wellford, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

In the instant case, thirty-nine Alabama municipal entities brought suit in the United States District Court for the Northern District of Alabama, alleging that five defendant chemical companies engaged in a conspiracy to fix prices for repackaged chlorine in Alabama in violation of both federal and state antitrust law. The plaintiffs also asserted claims for fraud under Alabama law. In a memorandum opinion, the district court ruled much of the plaintiffs' evidence inadmissible and granted summary judgment to all five defendants on the antitrust claims and the fraud claims. See City of Tuscaloosa v. Harcros Chems., Inc., 877 F. Supp. 1504 (N.D. Ala. 1995). We review the district court's evidentiary rulings, reversing in part and affirming in part. We then review the district court's summary judgment rulings. We reverse the district court's entry of summary judgment with regard to three of the five defendants on the antitrust claims, and remand for further proceedings. We also vacate the district court's entry of summary judgment on most of the fraud claims, and remand for further proceedings.

I.

A.

The plaintiffs and plaintiffs-intervenors in this case are thirty-nine Alabama municipal entities that purchase repackaged chlorine for the treatment of drinking water, sewage, and swimming pools. Repackaged chlorine is liquid chlorine that has been pressurized and stored in

1

containers for delivery to, and use by, chlorine consumers. The five defendant corporations are chemical companies that repackage or distribute chlorine in Alabama.[1]

At the core of the plaintiffs' claims are their allegations that the defendants colluded with each other to set prices for repackaged chlorine distribution contracts. During the period of the alleged collusion, many Alabama municipal entities purchased chlorine by auction.[2] An entity seeking to purchase chlorine would solicit sealed bids from companies that had submitted bids in the past. Once the bids were received, the buyer would publicly open the bids and announce what each competitor had bid. The buyer would then award its contract to the lowest bidder. The plaintiffs allege that the defendants submitted sealed bids based on "list prices" previously

---

[1] Defendant Harcros Chemicals, Inc., is a chlorine repackager organized under the laws of Delaware with its principal place of business in Kansas. Harcros was formerly known as Thompson-Hayward Chemical Co. For purposes of this opinion both Thompson-Hayward and Harcros will be referred to as "Harcros."

Defendant Van Waters & Rogers, Inc., is a chlorine repackager organized under the laws of the State of Washington with its principal place of business in Washington. In 1986, Van Waters & Rogers acquired the Moreland-McKesson Chemical Company. For purposes of this opinion, both companies are referred to as "Van Waters."

Defendant Jones Chemicals, Inc., is a chlorine repackager organized under the laws of the State of New York with its principal place of business in New York.

Defendant PB & S Chemical Company, Inc., is a chlorine repackager organized under the laws of the State of Kentucky with its principal place of business in Kentucky.

Defendant Industrial Chemicals, Inc., a chlorine distributor for defendants Jones Chemicals and PB & S Chemical Company, is organized under the laws of the State of Alabama with its principal place of business in Alabama.

The repackaging, distribution and sale of chlorine in Alabama takes place within the flow of interstate commerce, as is necessary for the plaintiffs to bring this action. See infra notes 5-7. Chlorine is imported into Alabama for repackaging and is then distributed and sold to Alabama municipal entities and to other customers in Alabama and elsewhere.

[2] A minority of municipal entities negotiated chlorine prices with one or more suppliers.

2

determined amongst themselves, and in this way allocated the repackaged chlorine contracts as they wished.

Following investigations of the chlorine industry in the Southeast by the United States Department of Justice and the State of Florida,[3] Alabama's former Attorney General requested authority from a number of Alabama municipal entities to bring an antitrust action against chlorine companies on their behalf. His successor, however, changed course and declined, on behalf of the state, to participate in the proposed litigation. See Harcros, 877 F. Supp. at 1511 n.19.

Fifteen Alabama municipal entities then decided to proceed independently and brought this action in July 1992. Numerous other municipal entities intervened, and several original plaintiffs withdrew from the case. The complaints filed by the final thirty-nine plaintiffs,[4] as amended, presented four counts. The first count alleged that the defendants had engaged in a conspiracy to fix prices, allocate customers or markets, and rig bids in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1994).[5] The second count asserted that the defendants had

---

[3] The Justice Department convened a grand jury to investigate the chlorine industry, including the defendants and others, but eventually dropped its investigation. Florida's separate investigation yielded two federal antitrust suits: the "peninsula" case, filed in Jacksonville, and the "panhandle" case, filed in Pensacola. The district court assigned to the "panhandle" case announced that it would grant defendants' motion for summary judgment, at which point the State of Florida agreed to settle both cases. See Harcros, 877 F. Supp. at 1511.

[4] The plaintiffs and plaintiffs-intervenors did not consolidate their two complaints into one. The two complaints, however, are largely identical.

[5] Section 1 provides:

§ 1. Trusts, etc., in restraint of trade illegal; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations,

3

engaged in a conspiracy to monopolize the chlorine market in Alabama in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 (1994).[6] The plaintiffs sought treble damages as relief on these federal antitrust claims pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15 (1994), and requested a permanent injunction preventing future collusion pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26 (1994).[7]

---

is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

[6] Section 2 provides:

§ 2. Monopolizing trade a felony; penalty

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

[7] Section 4 of the Clayton Act provides in relevant part:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Section 16 of the Clayton Act provides in relevant part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same

4

The third count of the complaints asserted that the defendants conspired to restrain trade in violation of Alabama Code § 8-10-1 et seq. (1993). The plaintiffs sought actual damages and $500 in statutory liquidated damages for each instance of injury or damage resulting from the alleged conspiracy pursuant to Alabama Code § 6-5-60 (1993).[8] The fourth count of the

---

conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity[.]

[8] Price-fixing conspiracies are made unlawful by § 8-10-3 of the Alabama Code, which provides:

§ 8-10-3 Restraint of trade or production; misdemeanor.

Any person or corporation, domestic or foreign, which shall restrain, or attempt to restrain, the freedom of trade or production, or which shall monopolize, or attempt to monopolize, the production, control, or sale of any commodity or the prosecution, management, or control of any kind, class, or description of business or which shall destroy, or attempt to destroy, competition in the manufacture or sale of a commodity shall be guilty of a misdemeanor and, upon conviction, shall be fined not less than $500 nor more than $2,000 for each offense.

Section 6-5-60(a) provides:

§ 6-5-60 Generally.

(a) Any person, firm, or corporation injured or damaged by an unlawful trust, combine or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of $500 and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly and may commence the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly. All such actions may be prosecuted to final judgment against any one or more of the defendants thereto, notwithstanding there may be a dismissal, acquittal, verdict, or judgment in favor of one or more of the defendants.

Under Alabama law, federal antitrust law "prescribe[s] the terms of unlawful monopolies and restraints of trade as they should . . . be administered in Alabama." Ex parte Rice, 67 So. 2d 825, 829 (Ala. 1953); see also McCluney v. Zap Prof'l Photography, 663 So. 2d 922, 926 (Ala. 1995) (citing Rice for the proposition that federal law relating to monopolization governs actions

plaintiffs' complaints asserted fraud claims under Alabama law.  See Ala. Code § 6-5-100 et seq. (1993).  The plaintiffs sought compensatory and punitive damages for these claims.

After discovery, the defendants moved to exclude the testimony of two of the plaintiffs' three expert witnesses, and to exclude several pieces of evidence that they asserted were inadmissible hearsay.  The defendants also moved for summary judgment.

The district court, in a lengthy memorandum opinion, excluded the purported hearsay testimony, see Harcros, 877 F. Supp. at 1518-21, 1538, and much of the plaintiffs' expert testimony.  See id. at 1524-30, 1532.  The district court then granted summary judgment for the defendants on all claims.  See id. at 1521-24, 1532-38.  The plaintiffs now appeal, asserting that the district court improperly excluded their proffered evidence and that summary judgment was erroneously entered.

B.

We first review the district court's rulings on the admissibility of the purported hearsay evidence.  Rulings on the admissibility of evidence are reviewed for abuse of discretion.  See Walker v. NationsBank of Fla. N.A., 53 F.3d 1548, 1554 (11th Cir. 1995) ("The admissibility of evidence is committed to the broad discretion of the district court, and the decision to exclude certain evidence will be reversed only upon a clear showing of abuse of discretion."); see also Hines v. Brandon Steel Decks, Inc., 886 F.2d 299, 302 (11th Cir. 1989) (applying abuse of discretion standard to hearsay admissibility determination).  "A district court by definition

brought under section 6-5-60).  Our discussion of the relevant federal law, see infra part III, therefore applies to and controls our disposition of the plaintiffs' state-law antitrust claims as well as their federal antitrust claims.

abuses its discretion when it makes an error of law." Koon v. United States, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047, 135 L. Ed. 2d 392 (1996). Thus, when the district court misinterprets the Federal Rules of Evidence or controlling case law, our review is plenary. Cf. Joiner v. General Elec. Co., 78 F.3d 524, 529 (11th Cir. 1996), rev'd on other grounds, — U.S. —, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).

The factual findings of the district court that underlie its decisions regarding the admissibility of the purported hearsay evidence – such as its findings regarding whether a statement was made in furtherance of a conspiracy, or whether a particular document is a regular business record – are reviewed for clear error. See United States v. Bazemore, 41 F.3d 1431, 1434 (11th Cir. 1994); United States v. Turner, 871 F.2d 1574, 1581 (11th Cir. 1989). A finding of fact is clearly erroneous when, after reviewing the entirety of the evidence, the reviewing court "is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511, 84 L. Ed. 2d 518 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746 (1948)).

After reviewing the district court's rulings on the admissibility of the purported hearsay evidence, we turn to that court's rulings on the admissibility of the plaintiffs' expert testimony. The Supreme Court recently has clarified the standard of review applicable to appellate consideration of determinations regarding the admissibility of expert testimony. See General Elec. Co. v. Joiner, — U.S. —, 118 S. Ct. 512, 139 L. Ed. 2d. 508 (1997), rev'g 78 F.3d 524, 529 (11th Cir. 1996). In Joiner, the Court noted that a district court's evidentiary rulings are reviewed for abuse of discretion. See id. at —, 118 S. Ct. at 517. The Court then held that

7

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), did not alter this long-standing rule in the specific context of expert testimony, and in fact did not address the standard of appellate review of such rulings at all. See Joiner, — U.S. at —, 118 S. Ct. at 517. The Court went on to note that a court of appeals should apply this abuse of discretion standard of review uniformly, without regard to whether the district court ruling under review allowed or disallowed the expert testimony at issue. Id. We therefore review the district court's rulings excluding the plaintiffs' expert testimony for abuse of discretion. To the extent that a ruling of the district court turns on an interpretation of a Federal Rule of Evidence or on the court's decision to apply Daubert, however, our review is plenary. See Joiner v. General Elec. Co., 78 F.3d at 529, rev'd on other grounds, — U.S. —, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); Carmichael v. Samyang Tire, Inc., 131 F.3d 1433, 1435 (11th Cir. 1997), cert. granted sub nom. Kumho Tire Co. v. Carmichael, — U.S. —, 118 S. Ct. 2339, 141 L. Ed. 2d 711 (1998).

Having examined the district court's evidentiary rulings, we finally proceed to review the district court's entry of summary judgment on the basis of the admissible evidence. This review proceeds de novo. See Southern Card & Novelty, Inc. v. Lawson Mardon Label, Inc., 138 F.3d 869, 873 (11th Cir. 1998); Uniforce Temp. Personnel, Inc. v. National Council on Compensation Ins., Inc., 87 F.3d 1296, 1299 (11th Cir. 1996). "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). "The party seeking

8

summary judgment [must] identify[] for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact." Cohen v. United Am. Bank of Cent. Fla., 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting Cox v. Administrator United States Steel & Carnegie 17 F.3d 1386, 1396 (11th Cir. 1994) (in turn quoting Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2552). "There is no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." Cohen, 83 F.3d at 1349.

## II.

### A.

We consider first the district court's rulings regarding the admissibility of testimony that the defendants moved to exclude as inadmissible hearsay. We reverse in part and affirm in part.

### 1.

The plaintiffs proffered testimony regarding an alleged admission by the late Robert Jones ("Jones"), the former chairman, chief executive officer, and president of defendant Jones Chemicals. Loraine and Peter Cassassa, friends of Jones during the period of the alleged conspiracy, testified in depositions that on several occasions in the mid-1980s, Jones admitted to them that he was at that time involved in fixing chlorine prices in the Southeast. Loraine Cassassa testified that Jones told her that he "got together with the people [who were] submitting the bids and they knew what each other were going to bid before that bid was ever submitted."

She also testified that Jones told her that he knew such conduct was illegal, but that "[t]hat's how big business goes."  Peter Cassassa gave substantially identical testimony.

The district court excluded the testimony of the Cassassas as "hearsay."  See infra note 10; Harcros, 877 F. Supp. at 1518-19, 1538.  We conclude that the court erred as a matter of law by making this determination and therefore abused its discretion.  Accordingly, we reverse the ruling excluding that testimony.

Under the Federal Rules of Evidence, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  In general, "[h]earsay is not admissible except as provided by [the federal] rules . . . ."  Fed. R. Evid. 802.  A "statement by [a] party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," however, is deemed an admission by a party opponent and is excluded from the definition of hearsay.  Fed. R. Evid. 801(d)(2)(D); see Zaben v. Air Prods. & Chems., Inc., 129 F.3d 1453, 1456 (11th Cir. 1997).

Robert Jones, as president of Jones Chemicals from 1986 to 1989, and as the chairman and CEO of the company from 1986 to 1993, clearly was an "agent or servant" of the company.[9]

---

[9] Because Fed. R. Evid. 801(d)(2)(D) does not define the term "agent," we must assume that Congress intended to refer to general common law principles of agency when it used the term.  See United States v. Saks, 964 F.2d 1514, 1523-24 (5th Cir. 1992) (citing Community for Creative Non-Violence v. Reid, 490 U.S. 730, 109 S. Ct. 2166, 2172-73, 104 L. Ed. 2d 811 (1989)).  At common law, senior officers of a corporation normally are agents and servants of the corporation.  See 2A C.J.S. Agency § 4 (1972) ("An agent is . . . a person employed or authorized by another to act for him, or to transact business for him[, or] one entrusted with another's business . . . .") (citing cases); Restatement (Second) of Agency § 2 cmt. c (1958) ("[T]he officers of a corporation or a ship, . . . all of whom give their time to their employers, are servants equally with the janitor."); see also, e.g., Shelter Modular Corp. v. Cardinal Enters., Inc., 347 So. 2d 1334, 1338 (Ala. 1977) (vice-president of corporation is agent thereof); Ex parte

10

Moreover, the record on appeal establishes that Jones set chlorine prices for Jones Chemicals throughout the period of the alleged conspiracy. His purported statements regarding Jones Chemical's chlorine pricing practices thus "concern[ed] a matter within the scope of [his] agency or employment, made during the existence of the relationship." See, e.g., Guccione v. Hustler Magazine, Inc., 632 F. Supp. 313, 320 (S.D.N.Y.), rev'd on other grounds, 800 F.2d 298 (2d Cir. 1986) (statements made by chief executive officer of defendant corporation, within scope of his authority, held admissible). Jones' purported statements to the Cassassas are therefore admissible as non-hearsay party admissions under Fed. R. Evid. 801(d)(2)(D).[10]

---

Board of Sch. Comm'rs of Mobile County, 178 So. 63, 64 (Ala. 1937) ("It is the general rule of the common law that the relationship of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, not only what shall be done, but how it shall be done.").

[10] The district court found the testimony inadmissible as to Jones on two grounds: (1) that "the president of a corporation is not the 'alter ego' of the corporation," and that Jones therefore did not "speak for" the corporation, as the court believed was required by controlling Alabama evidence law; and (2) that the purported statements did not fall under the co-conspirator hearsay exception found in Fed. R. Evid. 801(d)(2)(E). See Harcros, 877 F. Supp. at 1518-19. Both of these rulings are in error.

First, it is well settled that the Federal Rules of Evidence, not state evidence law, govern the admissibility of evidence in cases in federal court. See Fed. R. Evid. 1101; Johnson v. William C. Ellis & Sons Iron Works, Inc., 609 F.2d 820, 821 (5th Cir. 1980). Under the Federal Rules, "it is [not] necessary to show that an employee or agent declarant possesses 'speaking authority,' tested by the usual standards of agency law, before a statement can be admitted against the principal." Wilkinson v. Carnival Cruise Lines, Inc., 920 F.2d 1560, 1565 (11th Cir. 1991). Instead, it is necessary that the content of the declarant's statement concern a matter within the scope of his employment or agency. See Fed. R. Evid. 801(d)(2)(D); Wilkinson, 920 F.2d at 1565. The district court therefore erred as a matter of law in holding otherwise.

Second, Rule 801(d)(2)(E) establishes that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is non-hearsay evidence. Fed. R. Evid. 801(d)(2)(E). As discussed below, we agree with the district court's conclusion that Jones' purported statements were not made "during the course and in furtherance of the conspiracy." That the Cassassas' testimony is not made admissible by Rule 801(d)(2)(E), however, does not change the fact that the testimony is admissible as a party admission under Rule 801(d)(2)(D).

11

The appellants argue that the Cassassas' testimony ought also to be admitted against the other defendants, on the ground that Jones' purported statements were made "during the course and in furtherance of the conspiracy" and therefore fall within the exemption contained in Rule 801(d)(2)(E). Declarations by one defendant in a conspiracy case may be admissible against other defendants as non-hearsay upon sufficient showing that the statement was made by a co-conspirator during the course and in furtherance of the conspiracy. See Fed. R. Evid. 801(d)(2)(E); Bourjaily v. United States, 483 U.S. 171, 175-76, 107 S. Ct. 2775, 2778-79, 97 L. Ed. 2d 144 (1987); United States v. Young, 39 F.3d 1561, 1571 (11th Cir. 1994). "For a declaration by one defendant to be admissible against other defendants . . . , the [plaintiffs] must establish by a preponderance of the evidence: (1) that a conspiracy existed, (2) that the defendant and the declarant were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy." United States v. Van Hemelryck, 945 F.2d 1493, 1497-98 (11th Cir. 1991); see also, e.g., United States v. Byrom, 910 F.2d 725, 734 (11th Cir. 1990); United States v. Allison, 908 F.2d 1531, 1533 (11th Cir. 1990) (citing Bourjaily, 483 U.S. at 175, 107 S. Ct. at 2778-79). In determining the admissibility of co-conspirator statements, the court may consider both the co-conspirator's hearsay statement and independent external evidence. See Bourjaily, 483 U.S. at 181, 107 S. Ct. at 2781; United States v. Chestang, 849 F.2d 528, 531 (11th Cir. 1988).

This circuit applies "a liberal standard in determining whether a statement is made in furtherance of a conspiracy." United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir. 1988). The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way. See United States v. Caraza, 843 F.2d 432, 436 (11th Cir. 1988) (per

12

curiam).  Statements made to solicit membership or participation in the conspiracy, for example, see United States v. Montes-Cardenas, 746 F.2d 771, 780 (11th Cir. 1984), or statements explaining the conspiracy to a new member, see United States v. Reyes, 798 F.2d 380, 384 (10th Cir. 1986), are made in furtherance of the conspiracy.  The determination of whether a statement is made in furtherance of a conspiracy is a finding of fact subject to review for clear error.  See United States v. Ayarza-Garcia, 819 F.2d 1043, 1050 (11th Cir. 1987).

Jones' purported statements do not satisfy even this liberal standard.  The purported statements were made to friends, who were neither involved in the alleged conspiracy nor invited to participate therein, over drinks or on the golf course.  The statements could not have furthered the interests of the alleged conspiracy in any way.  A statement that merely discloses the existence of a conspiracy to a non-conspirator, that merely "spills the beans," with no intention of recruiting the auditor into the conspiracy does not further the conspiracy.  See United States v. Posner, 764 F.2d 1535, 1538 (11th Cir. 1985) (holding that a letter written by a co-conspirator, containing preliminary appraisals of real estate, was not made in furtherance of a conspiracy to overvalue the real estate and thus was not admissible as the statement of a co-conspirator because the letter was not written to conceal the conspiracy and served only to disclose the scheme); see also United States v. Moss, 138 F.3d 742, 744 (8th Cir. 1998) (holding that "[a] statement made in furtherance of a conspiracy 'must somehow advance the objectives of the conspiracy, not merely inform the listener of the declarant's activities,'" in order to be admissible under Rule 801(d)(2)(E) (citation omitted)).

We conclude that the district court did not err in finding that Jones' purported statements were not made in furtherance of the alleged conspiracy, and that the Cassassas' testimony is

13

therefore not admissible against the alleged co-conspirators.  Because Jones' purported statements were non-hearsay party admissions, however, we conclude that the statements do fall within the exception contained in Rule 801(d)(2)(D), and that the Cassassas' testimony is therefore admissible against Jones Chemicals.

2.

The district court also excluded as inadmissible hearsay a typewritten notation on a bid tabulation compiled by one of the appellant municipal entities, the Board of the Mobile Water and Sewer Commission.  The bid tabulation lists the bids received by Mobile for a chlorine contract in April of 1987, and shows that Industrial Chemicals and Jones Chemicals submitted tie bids for the contract in question.  The typewritten notation on the bid tabulation sheet, which appears next to the Industrial bid, reads: "This is a complimentary bid for Jones.  As per O. W. Caine, Sales Manager, pass contract on to Jones Chem."  Caine was a sales manager for Industrial.  The appellants assert that this notation reflects Caine's, and hence Industrial's, intention to forgo the Mobile contract in order to maintain the distribution of contracts established by the alleged conspiracy.[11]

The district court excluded the notation as hearsay, apparently on the ground that it did not qualify as a party admission.  See Harcros, 877 F. Supp. at 1520.  We do not reach the

---

[11] The plaintiffs assert that complimentary bids, i.e., bids submitted with no intention of winning the contract in question, were used by the defendants to create the illusion of competition in the Alabama chlorine market.  The defendants reply that, because municipal entities often would solicit bids only from companies that had bid on previous contracts, complimentary bids were used merely to stay in the running for future contracts when, for whatever reason, a company did not wish, or was not able, to pursue a particular contract.

14

question of whether the district court erred in excluding the notation, because the notation adds

nothing to Caine's affidavit testimony, discussed infra, for purposes of summary judgment.[12]

---

[12] The district court apparently excluded the Caine notation on the ground that it did not qualify as a party admission under Rule 801(d)(2)(D); since Caine did not have final authority over chlorine bids, the court viewed any statement by him regarding the Mobile bid in question as "unauthorized." Harcros, 877 F. Supp. at 1520. As discussed in note 10, supra, the Federal Rules of Evidence do not require that Caine have had "speaking authority" in order for his statement to be admissible under the party admission exception; the district court's rationale was therefore legally erroneous. We could not determine whether the Caine notation is actually admissible as a party admission under Rule 801(d)(2)(D) even if it were necessary to do so, however, because the writer of the notation has not been identified and the record on appeal does not disclose whether the document was properly authenticated in the district court. The district court excluded the notation without a hearing, solely on the basis of the parties' briefs.

The plaintiffs also argued that the notation was admissible as a regular business record under Rule 803(6). Rule 803(6) provides an exception from the general prohibition on hearsay when the proffered statement is

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed. R. Evid. 803(6). The district court apparently rejected this argument without comment, and the plaintiffs complain of this holding on appeal. On the basis of the inadequate record on appeal, the notation appears not to have been a properly authenticated regular business record. The notation is admissible under Rule 803(6) if it is "[a] memorandum [or] record . . . of acts [or] events . . . made at or near the time by, or from information transmitted by, a person with knowledge" of the acts in question, and "if it was the regular practice of the business activity to make the memorandum [or] record . . . all as shown by the testimony of the custodian or other qualified witness, unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6) (emphasis added). From the record on appeal, the Caine notation appears not to satisfy the requirements of the business records exception because the record reveals no attempt whatsoever to authenticate the notation, as is explicitly required by Rule 803(6). See Fed. R. Evid. 803(6); United States v. Williams, 837 F.2d 1009, 1013 n.6 (11th Cir. 1988) (proper foundation for admission of 803(6) testimony should include testimony of witness with personal knowledge of how document was compiled); Itel Capital Corp. v. Cups Coal Co., 707 F.2d 1253, 1259-60 (11th Cir. 1983) (person who

15

The district court also excluded an affidavit offered by Caine, and provided numerous reasons for doing so. See Harcros, 877 F. Supp. at 1520. Portions of the affidavit, the court stated, were "ambiguous" because "none of [the affidavit] testimony establish[ed] conspiracy." The court also concluded that "[t]he other portions of Mr. Caine's affidavit add[ed] nothing" because they were "inadmissible hearsay" and because the affidavit could not "stand alone."

All of these grounds for excluding Caine's affidavit testimony are erroneous. Questions regarding the weight of the affidavit testimony, such as whether the affidavit is "ambiguous," are not matters for consideration by the court on summary judgment. The factfinder at trial will decide whether to lend credence to the affidavit information. With regard to the portions of the affidavit that the court ruled were "inadmissible hearsay," we believe the court erred in its determination. As noted in part II.A.1, supra, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). No part of Caine's affidavit fits this definition. Caine

_____

actually prepared business record need not testify but other circumstantial evidence and testimony must suggest trustworthiness of documents); United States v. Dreer, 740 F.2d 18, 20 (11th Cir. 1984) (proper foundation for admission of business record must sufficiently indicate reliability, including "circumstances surrounding the origin and the nature of the compilation"). The district court rejected the plaintiffs' invocation of the business records exception, however, in the same fashion that it rejected their reliance upon the party admission exception – on the basis of the parties' briefs alone. We therefore could not determine whether the district court erred in concluding that the Caine notation is not admissible under Rule 803(6), even if it were necessary to do so.

We also note that, even if the notation is determined not to be admissible as hearsay, the notation might be admissible as non-hearsay insofar as it is not offered to prove the truth of the matter asserted. See Fed. R. Evid. 801. The Caine notation might be offered for several purposes other than to prove the truth of the matter asserted. The notation merely could not be offered to prove that Caine instructed the Mobile board to withdraw Industrial's bid; the appellants would have to rely on Caine's affidavit testimony and other evidence to support that proposition.

16

testifies in his affidavit regarding the withdrawn Mobile bid, bidding practices at Industrial, and bidding practices at Harcros – all matters in which he personally participated or which he personally observed. At no point in the affidavit does Caine relate any statement made by anyone that constitutes inadmissible hearsay.[13] The district court therefore abused its discretion in excluding Caine's affidavit testimony. Consequently, we conclude that this testimony is admissible in its entirety.

3.

---

[13] Two statements in the Caine affidavit may have been the cause of the district court's hearsay concerns. In discussing a bid that he participated in submitting to the Mobile Water and Sewer Board in 1987, while employed as a sales representative for Industrial in the Mobile/Dothan area, Caine stated: "Mr. William Welch of Industrial Chemicals told me that, because there was a tie bid and Jones was the incumbent, Industrial needed to bow out gracefully." The following sentence of Caine's affidavit read: "I then communicated that information to Mrs. Whitworth [of the Mobile Board] . . . ."

The alleged statement of Welch to Caine, however, constitutes a non-hearsay admission by a party opponent. See Fed. R. Evid. 801(d)(2)(D). Welch, as president of Industrial, was an agent of the company. In addition, since Welch stated in his deposition that he had sole responsibility for determining chlorine bid prices during a period that included 1987, his statement that Industrial should "bow out" of this particular chlorine bid concerned a matter within the scope of his agency and was made during the existence of that agency relationship. Cf. supra note 9 and accompanying text.

Caine's report of his past statement to Mrs. Whitworth also qualifies as a non-hearsay admission under Rule 801(d)(2)(D). Welch stated in his deposition that Caine was an Industrial sales representative who served the Mobile area during 1987. As such, Caine was an agent of Industrial when he communicated Welch's "bow out" directive to Mrs. Whitworth of the Mobile Board. Communicating a bid (or the withdrawal thereof) authorized by his supervisor to a prospective customer in the Mobile area surely was within the scope of Caine's agency as a sales representative for that area. We express no opinion on whether this statement would constitute inadmissible hearsay if it did not qualify as an admission.

17

The district court also excluded the testimony of Barbara Krysti, who offered testimony against Harcros. See Harcros, 877 F. Supp. at 1520-21. Barbara Krysti is the widow of Lloyd Krysti, who was a sales manager at Harcros. Barbara Krysti stated in an affidavit that

> [i]n 1987 or 1988, Lloyd found out that Joe Ragusa [(Harcros' vice-president for the Southeast)] was getting together with his competitors and fixing the price of chlorine before bids were submitted. Lloyd's reaction to me was that Joe was crazy for doing this and that it was illegal and that he could go to jail. . . . Lloyd first told me about the price fixing in 1988. We talked about it several times after that.

The proffered testimony is double hearsay; Barbara Krysti relates Lloyd Krysti's account of what Joe Ragusa said.[14] Such "hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Fed. R. Evid. 805; see, e.g., Mahlandt v. Wild Canid Survival and Research Ctr., Inc., 588 F.2d 626, 630 (8th Cir. 1978). Because chlorine pricing and sales were within the scope of Joe Ragusa's employment with Harcros, Ragusa's statements to Lloyd Krysti clearly fall within the party admission exception to the hearsay rule.

Lloyd Krysti's statements to Barbara Krysti, however, do not fall within any exception to the hearsay rule. The record establishes that chlorine pricing was not substantially within the scope of Lloyd Krysti's employment. Lloyd Krysti was involved in the pricing and sales of other chemicals and was rarely and only ministerially involved in chlorine sales. Lloyd Krysti did not set prices for chlorine. Indeed, the plaintiffs themselves assert that Joe Ragusa was

---

[14] We assume arguendo that Lloyd Krysti "found out" about the alleged conspiracy through conversations with Ragusa or by overhearing Ragusa speak about the conspiracy. Even if Lloyd "found out" about the alleged conspiracy in some other fashion, however, our conclusion – that Barbara Krysti's testimony is inadmissible – remains the same. No matter how Lloyd Krysti "found out" about the conspiracy, Barbara Krysti's recitation of his statements to her is inadmissible hearsay for the reasons stated in the text.

solely responsible for setting chlorine prices in Alabama, and none of the many Harcros documents in the record indicate otherwise. On the contrary, in a 1984 memorandum, Ragusa severely upbraided several Harcros sales managers who set chlorine prices without his approval.

Because the content of Lloyd Krysti's statements did not concern a matter within the scope of his employment or agency, they do not fall within the party admission exception in Rule 801(d)(2)(D). See Wilkinson, 920 F.2d at 1565-66. In addition, Lloyd Krysti's statements were not made in furtherance of the alleged conspiracy, but "merely informed" Barbara Krysti – a non-conspirator – of the existence of the alleged conspiracy. See Moss, 138 F.3d at 744; cf. Fed. R. Evid. 801(d)(2)(E). Because Lloyd Krysti's statements to Barbara Krysti do not fall within any exception to the hearsay rule, we affirm the district court's ruling excluding the testimony of Barbara Krysti.

B.

We next turn to the district court's rulings on the admissibility of the plaintiffs' proffered expert testimony. The district court excluded the testimony of Perry Garner, a certified public accountant. Garner offered data and testimony regarding costs borne and profits garnered by the defendants in the Alabama chlorine market, and also verified the data included in a database prepared by another of the plaintiffs' experts, statistician James McClave. McClave offered data showing, and testimony regarding the statistical significance of, market shares in the Alabama chlorine market, incumbency rates (i.e., the frequency with which companies retained chlorine contracts with particular municipalities from year to year), the frequency of tie bids in the market, prices bid by the defendants, winning bid prices, and costs borne by the defendants. The

19

district court excluded McClave's testimony, in its entirety, as well. The data compiled by McClave were also used by Dr. Robert Lanzillotti, an economist who offered deposition testimony as well as a report regarding the economic structure of the Alabama chlorine market and the likelihood, from an economic standpoint, that a price-fixing conspiracy existed in that market. The district court criticized Lanzillotti's testimony at length, see Harcros, 877 F. Supp. at 1524-28, 1530-32, but did not exclude the evidence. See id. at 1538. The defendants do not challenge the district court's denial of their motion to exclude Lanzillotti's testimony.

Federal Rule of Evidence 702,[15] as explained by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 2794-95, 125 L. Ed. 2d 469 (1993), and its progeny, controls determinations regarding the admissibility of expert testimony. Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert;[16] and (3) the testimony assists the trier of fact, through the application of

---

[15] Rule 702 reads:

Rule 702. Testimony by Experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[16] The Daubert Court noted that "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one." Daubert, 509 U.S. at 594, 113 S. Ct. at 2797. "Many factors will bear on the inquiry [into whether an expert's reasoning or methodology is reliable], and we do not presume to set out a definitive checklist or test." Id. at 593, 113 S. Ct. at 2796. Nevertheless, the Court did identify certain factors that may be pertinent to such an inquiry. These factors include: "whether [the theory or technique at issue] can be (and has been) tested"; whether it "has been

scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. See Fed. R. Evid. 702; Daubert, 509 U.S. at 589, 113 S. Ct. at 2794 (holding that "under the [Federal] Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); Joiner v. General Elec. Co., 78 F.3d at 529-30, rev'd on other grounds, — U.S. —, 118 S. Ct. 512, 139 L. Ed. 2d. 508 (1997) (stating that Rule 702 requires that the expert be qualified and that his testimony assist the trier of fact); see also Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1238 (3d Cir.), cert. denied sub nom. Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc., 510 U.S. 994, 114 S. Ct. 554, 126 L. Ed. 2d 455 (1993) (combining Rule 702's requirements with the reliability requirement in a three-part test for admissibility).

We conclude that the district court abused its discretion in excluding Garner's testimony and therefore reverse that ruling. We further conclude that the district court's interpretations of Daubert and of Rules 104 and 702, which formed the basis for the court's exclusion of the testimony of McClave, were erroneous as a matter of law. We also believe, however, that portions of McClave's testimony lie outside of his competence as a statistician and that the methodology underlying a small portion of McClave's data and testimony is fundamentally flawed, thus requiring the exclusion of those portions of McClave's data and testimony. Accordingly, we affirm the district court's ruling with regard to these portions, but reverse its ruling excluding the remainder of McClave's testimony.

---

subjected to peer review and publication"; the "known or potential rate of error" of the technique, as well as the "existence and maintenance of standards controlling [its] operation"; and the degree to which the relevant scientific community accepts the theory or technique as reliable. Id. at 593-94, 113 S. Ct. at 2796-97. We discuss these factors in greater detail in note 25, infra.

1.

Garner analyzed the costs, revenues, and profits of the defendants and verified the data compiled by McClave and used by McClave and Lanzillotti.  Although the defendants did not move to exclude Garner's testimony, the court excluded it sua sponte without benefit of a Daubert hearing and with little discussion:

> The "expert" testimony of Mr. Perry Garner, C.P.A., is also inadmissible.  He is no more qualified than Dr. McClave to testify on opinions based on economic theory.  His deposition testimony regarding Van Waters' actual profit margins shows only that he did not consider a number of important cost factors.  Significantly, exhibits produced by Mr. Garner have all been produced since his deposition at which time he expressed no opinions concerning the possibility of the existence of or the members of any antitrust conspiracy.

Harcros, 877 F. Supp. at 1532.

In evaluating the district court's reasoning under our three-part test for admitting expert testimony, we begin by concurring with the district court's assertion that Garner was not qualified to render opinions based on economic theory.  Nowhere in his extensive testimony, however, did Garner offer any such opinion.  As to the testimony that Garner did offer, it seems apparent that he was qualified to provide it.[17]  With respect to the reliability element, the district court did not identify the "important cost factors" that Garner ostensibly overlooked and that could have affected the reliability of his methodology.  Upon review of Garner's testimony, we

----

[17] Garner holds a C.P.A. license and has experience analyzing the books of companies that participate in allegedly collusive markets.  The defendants, who did not move for the exclusion of his testimony, do not attack his methodology on appeal.  We do not doubt that accounting expertise is among the sorts of technical and specialized expertise the use of which is governed by Rule 702 and Daubert.  See Morse/Diesel, Inc. v. Trinity Indus., Inc., 67 F.3d 435, 444 (2d Cir. 1995) (stating in dicta that expert testimony of certified public accountants is likely to be admissible); Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 186 (7th Cir. 1993) (requiring application of Daubert standard to accountant's expert testimony).

find that he considered material costs, labor costs, overhead costs, transportation costs, depreciation costs, insurance costs, and a host of other costs. We are at a loss to identify any "important cost factors" that Garner overlooked. Finally, Garner need not have expressed any opinion regarding the existence of any conspiracy in order for his testimony to be admissible under Rule 702; his testimony need only have "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Garner's testimony does so by calculating, compiling, and explaining the costs borne and profits enjoyed by the defendants during the period of the alleged conspiracy; this information would assist the trier of fact in determining whether, for purposes of the antitrust claims, the defendants acted in a consciously parallel fashion[18] and whether, for purposes of the fraud claims, defendants' costs impelled price increases. We therefore conclude that the district court abused its discretion in excluding Garner's testimony.

2.

The district court criticized at length the testimony of the plaintiffs' statistician, Dr. James McClave, and ultimately excluded McClave's testimony in its entirety. We hold that the district court excluded McClave's data and testimony on the basis of a legally erroneous interpretation of Rule 702, and that the court abused its discretion in excluding McClave's

---

[18] As is discussed in part III.A.3, infra, in order to prevail on their claim of the existence of a price-fixing conspiracy without direct evidence, the plaintiffs must show (1) that the defendants acted in a consciously parallel fashion, and (2) "plus factors" that tend to exclude the possibility of non-collusive action. See Dunnivant v. Bi-State Auto Parts, 851 F.2d 1575, 1583 (11th Cir. 1988); Gainesville Utils. Dep't v. Fla. Power & Light Co., 573 F.2d 292, 300-02 (5th Cir. 1978).

23

testimony in its entirety. We conclude, however, that parts of McClave's testimony must be excluded because those parts concern issues that are outside McClave's area of competence as a statistician. We also hold that a small portion of McClave's data and testimony must be excluded because of a flaw in the statistician's definition of the relevant market.

The district court's memorandum opinion offered several grounds for excluding McClave's testimony.[19] See Harcros, 877 F. Supp. at 1528-30. Some of these grounds are sufficient to warrant the exclusion of parts of McClave's testimony. As the following discussion demonstrates, however, none of these grounds is sufficient to warrant the exclusion of McClave's testimony in its entirety (as would, for instance, a finding that McClave was not qualified to testify as an expert in antitrust statistics).[20] We therefore conclude that the district court abused its discretion in excluding admissible portions of McClave's testimony by ruling that McClave's testimony in its entirety was inadmissible.

The district court first attacked McClave's methodology:

McClave's methodology to determine the existence of a conspiracy is his subjective judgment. His subjective judgments, however, cannot be tested. His opinions about whether high losing bids are signals is based on looking at the data using his "experience" and "judgment." He admits there is no statistical test to determine that a high losing bid is a signal. His statistical analysis is not impressive. Having testified, McClave has not made a case under Fed. R. Evid. 104. His statistics show anything but a successful conspiracy.

---

[19] The district court's opinion is far from clear. The grounds for the exclusion of McClave's testimony that we identify are those that we are able to reconstruct from the conclusory and disjointed miscellany that constitutes the district court's discussion of McClave's testimony.

[20] The defendants do not assert, and could not reasonably assert, that McClave is not qualified to testify as to statistical evidence in antitrust cases. McClave holds a Ph.D. in statistics and has considerable experience in the analysis of markets alleged to be collusive.

Harcros, 877 F. Supp. at 1529. Review of this passage reveals two fundamental legal errors. We first consider an error that pervades the court's opinion: the confusion and conflation of admissibility issues with issues regarding the sufficiency of the plaintiffs' evidence to survive summary judgment.[21] To put it succinctly, McClave's data and testimony need not "show a successful conspiracy" to be admitted under Rule 702 as circumstantial evidence of a conspiracy. As expert evidence, the testimony need only <u>assist</u> the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. As circumstantial evidence, McClave's data and testimony need not prove the plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury. See Burrell v. Board of Trustees of Ga. Military College, 970 F.2d 785, 793 (11th Cir. 1992); 1 John W. Strong et al., McCormick on Evidence § 185, at 777 (4th ed. 1992) ("Direct evidence is evidence which, if believed, resolves a matter in issue. Circumstantial evidence may also be testimonial, but even if the circumstances depicted are accepted as true, additional reasoning is required to reach the proposition to which it is directed." (internal citation omitted)). In requiring that McClave's data and testimony "show a successful conspiracy" in order to be admitted into evidence, therefore, the district court misinterpreted

---

[21] It is apparent that this problem, along with many others that we identify in this part of the opinion, might have been avoided had the district court simply held a Daubert hearing to allow the parties to clarify their positions, as well as the law, regarding the admissibility of these experts' testimony. While Daubert hearings are not required by law or by rules of procedure, they are almost always fruitful uses of the court's time and resources in complicated cases involving multiple expert witnesses, such as the instant case.

25

Rule 702 and thus abused its discretion.  See Koon, 518 U.S. at 100, 116 S. Ct. at 2047 ("A district court by definition abuses its discretion when it makes an error of law.").[22]

The district court also erred in relying upon Rule 104 of the Federal Rules of Evidence as support for its exclusion of McClave's data and testimony.  Rule 104(b) allows a district court to determine preliminary questions of fact necessary to apply the Federal Rules of Evidence.  The rule itself, however, does not provide a ground for the exclusion of any evidence as inadmissible under the Rules.  The district court's incorrect use of Rule 104 was apparently rooted in its concern about the reliability of McClave's testimony.[23]  This concern, however, is properly addressed under Rule 702 and Daubert.  See Daubert, 509 U.S. at 589, 113 S. Ct. at 2795.  The district court's erroneous reliance upon Rule 104 is thus a second ground for concluding that the court abused its discretion in excluding McClave's testimony in its entirety.

The district court's fundamental criticism of McClave's testimony – that McClave's assertions regarding the existence of a conspiracy in general, and his characterization of certain bids as "signals" to co-conspirators in particular, were outside of his competence as a statistician – is, however, essentially correct.  McClave's testimony is admissible only insofar as it assists

---

[22] This error is repeated in the district court's discussion of McClave's analysis of tie bids, see Harcros at 1529, and of Industrial's profits, see id. at 1529-30.  Whether or not McClave's testimony, standing alone, supports an inference that Industrial or any other defendant actually conspired to fix prices is not relevant to the question of the admissibility of the testimony; it is instead a matter for consideration at summary judgment, when the court must determine whether a trier of fact could find for the plaintiffs on the evidence adduced.  See Cohen v. United Am. Bank of Cent. Fla., 83 F.3d 1347, 1349 (11th Cir. 1996).

[23] We draw this conclusion on the basis of the district court's conclusory statement that McClave's "statistical analysis is not impressive."  As we explain below, we conclude that a small portion of McClave's testimony is in fact unreliable and inadmissible.  At this point, however, we endeavor to clarify the legal errors that permeate the district court's discussion of McClave's (and Lanzillotti's) testimony.

the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. His characterizations of documentary evidence as reflective of collusion, and his characterizations of particular bids as "signals," do not do so, because the trier of fact is entirely capable of determining whether or not to draw such conclusions without any technical assistance from McClave or other experts. In addition, McClave's opinions regarding the legal standards applicable to this case are outside of his competence and must be excluded.

On the other hand, most of McClave's testimony is entirely within his competence as a statistician and would be helpful to a trier of fact. Moreover, McClave utilized well-established and reliable methodologies in the preparation of most of his statistics and his testimony. He generated the statistics underlying his testimony through simple compilation of data from the plaintiff municipalities' records, from documents and books obtained from the defendants through discovery, and from public sources.[24] McClave's compilations of that data into utile measurements of bid prices, costs, tie bid frequencies, incumbency rates, and so on, and his testimony regarding estimated damages, are the products of simple arithmetic and algebra and of multiple regression analysis, a methodology that is well-established as reliable. See, e.g., Askew v. City of Rome, 127 F.3d 1355, 1365 n.2 (11th Cir. 1997) (in voting rights case, district court admitted expert statistical testimony based in part on multiple regression analysis); Petruzzi's, 998 F.2d at 1238.[25]

---

[24] The defendants do not attack the provenance or authenticity of McClave's raw data.

[25] Twenty-nine states, along with the territories of Guam and Puerto Rico, have briefed this appeal as amici curiae in support of the appellant municipalities. The amici helpfully point out that, although "an important aspect of assessing scientific validity (and therefore evidentiary

We therefore conclude that most of McClave's testimony (all that is within his competence as a statistician) satisfies the three interrelated requirements for admission under Rule 702: McClave is qualified to testify regarding statistical measurements of events in the Alabama chlorine market during the period of the alleged conspiracy, such testimony will assist the trier of fact, and the methodologies that McClave used in measuring these events are generally reliable. Upon closer review, however, we find that the methodology underlying a small portion of McClave's data and testimony is fundamentally flawed, and that the evidence based thereon is consequently unreliable and must be excluded.

---

reliability) is the ability of other scientists to test or retest a proponent's theory," not every scientific or technical methodology applied by expert witnesses is susceptible to such an analysis. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 758 (3d Cir. 1994), cert. denied sub nom. General Elec. Co. v. Ingram, 513 U.S. 1190, 115 S. Ct. 1253, 131 L. Ed. 2d 134 (1995). Economic or statistical analysis of markets alleged to be collusive, for instance, cannot readily be repeatedly tested, because each such case is widely different from other such cases and because such cases cannot be made the subject of repeated experiments. The proper inquiry regarding the reliability of the methodologies implemented by economic and statistical experts in this context is not whether other experts, faced with substantially similar facts, have repeatedly reached the same conclusions (because there will be few or no cases that have presented substantially similar facts). Instead, the proper inquiry is whether the techniques utilized by the experts are reliable in light of the factors (other than testability) identified in Daubert and in light of other factors bearing on the reliability of the methodologies. See supra note 16; see also, e.g., Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc., 925 F. Supp. 1247, 1252-53 (S.D. Ohio 1996) (noting that Daubert factors should be applied flexibly in determining admissibility of economic and statistical expert testimony); In re Aluminum Phosphide Antitrust Litig., 893 F. Supp. 1497, 1506 (D. Kan. 1995) ("To the extent that Daubert factors are relevant to its determination [whether an economist's methodologies are reliable], the Court considers them along with any other relevant factors. . . . The inquiry is a flexible one, with the overarching subject being the evidentiary relevance and reliability of the principles that underlie a proposed submission."). One factor left unenumerated by the Daubert Court is whether "the methods used by the expert to derive his opinion satisfy the standards for scientific methodology that his profession would require of his out-of-court research." People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205, 111 F.3d 528, 537 (7th Cir. 1997). Taking this factor into account along with the factors identified in Daubert, we readily conclude that McClave's methodologies are quite reliable, with the small exception explained infra.

The district court correctly pointed out that McClave's database included data regarding chlorine sales in the Florida panhandle as well as in Alabama.[26] See Harcros, 877 F. Supp. at 1528 & n.57. The inclusion of Florida sales data is problematic because, as the district court pointed out, "[t]he suit alleges a conspiracy in the state of Alabama – not Alabama, the Florida panhandle, and the Southeastern states." Id. Data relevant to allegations of collusive activity in Florida may be used for corroborative purposes, but should not be commingled with data regarding Alabama transactions for purposes of making calculations intended to be used as circumstantial evidence of collusive behavior in Alabama. Including data regarding transactions that were not part of the alleged conspiracy in the database skews any cumulative measurements, such as percentages or frequencies, that depend upon the size and characteristics of the database as a whole and that are intended to describe the alleged conspiracy.

On the other hand, most of McClave's data, as well as the testimony regarding that data, do not suffer from this problem; these data either do not include any information regarding transactions in Florida, include only Florida data that can readily be separated from Alabama data, or are not expressed in percentages or frequencies and thus are not skewed by the inclusion of Florida data. McClave's data regarding the frequency of tie bids and of incumbent bidders retaining contracts, for instance, are for the Alabama market alone, and do not include Florida

---

[26] The district court also attacked McClave's market definition on the ground that "Dr. McClave calls his statistics 'market' shares, but admits that his numbers only include that portion of the market in which the plaintiffs buy chlorine by sealed bids." Harcros, 877 F. Supp. at 1529 n. 58. Our review of the record reveals that the court's assertion is false; McClave's database did indeed include data from the Alabama municipalities that purchased chlorine through negotiations with the defendants and other chemical companies rather than through sealed-bid auctions, and McClave so stated in both his prepared report and his deposition testimony.

29

data; these data, and the testimony based thereon, are thus reliable and admissible. McClave's

data on bid prices and on the costs borne by the defendants are not expressed in percentages or

frequencies but in mere compilations of prices and costs. Since the Florida data on prices and

costs can readily be separated from the Alabama data, the Florida data may be used by the trier

of fact for corroborative purposes if they indicate collusive behavior in the Florida panhandle or

ignored if they do not. McClave's market share measurements regarding the northern half of

Alabama do not include Florida data and are therefore admissible; McClave's measurements of

the defendants' respective market shares for the southern half of Alabama and for the Florida

panhandle, on the other hand, are skewed by the inclusion of the Florida data and must be

excluded.

In sum, we affirm the district court's exclusion of McClave's data and testimony in part

and reverse it in part. We affirm the district court's exclusion of McClave's measurements and

testimony regarding market shares in the southern Alabama submarket. We also affirm the

district court's exclusion of McClave's opinions regarding the law controlling the case and of his

characterizations of documentary evidence as tending to show collusive behavior. We reverse

the district court's exclusion of the remainder of McClave's data and testimony.[27]

---

[27] As noted in the introduction to part II.B, supra, the district court lengthily criticized the testimony of Dr. Robert Lanzillotti, an economist whose testimony as an expert was proffered by the plaintiffs; the court did not, however, exclude Lanzillotti's testimony. The defendants have not questioned the district court's denial of their motion to exclude Lanzillotti's testimony. We note in passing that much of Lanzillotti's testimony does indeed appear to warrant exclusion: specifically, Lanzillotti's opinions regarding the legal standards applicable to the case are outside of his competence as an economist (and are erroneous) and should be excluded. The same is true of Lanzillotti's characterizations of pieces of documentary evidence as tending to show collusion; such judgments are for the court to make at summary judgment and for the trier of fact to make at trial. Furthermore, we point out that Lanzillotti's professed market definition is clearly wrong. Lanzillotti stated in his report that "[t]he relevant geographic market is the

30

III.

We now turn to the district court's rulings granting summary judgment in favor of the defendants. We consider the court's rulings on the plaintiffs' antitrust claims,[28] and then the court's treatment of the plaintiffs' fraud claims.

A.

1.

We first take up the district court's entry of summary judgment in favor of Jones Chemicals. The district court concluded that summary judgment in favor of Jones Chemicals was warranted because Jones "do[es] not have that much economic power to make a conspiracy stick." Harcros, 877 F. Supp. at 1535. We read this statement as an indication that the district

---

largest market for which data are available and facilitate a more comprehensive understanding of what transpired in the State of Alabama." This is contrary to law and scholarship; the relevant geographic market is the market that includes "producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services." Levine v. Central Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1552 (11th Cir.), cert. denied, — U.S. —, 117 S. Ct. 75, 136 L. Ed. 2d 34 (1996) (quoting IIA Phillip E. Areeda et al., Antitrust Law ¶ 530a, at 150 (1995)). Whether the litigants in a particular case are able to compile data regarding a particular market is irrelevant to the market definition analysis. See also Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566, 1573 (11th Cir. 1991) (discussing geographic market definition process in detail). We express no opinion as to whether the market definition that Lanzillotti actually used in his analysis is the one that he professed to use in his report; nor do we express any opinion as to whether the use of the professed market definition would have any derogatory effect upon the reliability of his testimony. We merely point out that the sort of market definition that Lanzillotti professed to use in his report – one with an apparent eye toward litigation – is inaccurate.

[28] As explained in note 8, supra, our disposition of the plaintiffs' state-law antitrust claims is identical to our disposition of their federal antitrust claims.

31

court, viewing the evidence in the light most favorable to the plaintiffs, concluded that the trier of fact could not find for the plaintiffs and against Jones on the basis of the economic and statistical evidence and on the basis of other circumstantial evidence (such as memoranda and other documents that, the plaintiffs assert, indicate attempts by the defendants to establish and maintain the alleged conspiracy).  If this was the district court's conclusion, we hold that the court erred for the reasons discussed in part III.A.3, infra.

More importantly, we hold that the entry of summary judgment in favor of Jones Chemicals must be reversed because Robert Jones' admissions to the Cassassas constitute powerful direct evidence that Jones Chemicals was involved in collusive behavior in the Alabama chlorine market during the mid-1980s.  In the absence of overwhelming evidence to the contrary (and as discussed infra, we conclude that no overwhelming evidence has been produced by the defendants), the trier of fact could well find in favor of the plaintiffs against Jones Chemicals on the basis of these admissions alone.  The district court's entry of summary judgment in favor of Jones Chemicals on the plaintiffs' several antitrust claims is therefore reversed.


2.

We next turn to the entry of summary judgments in favor of Van Waters and PB & S. The district court correctly pointed out that PB & S

> was a nonplayer in the "South Alabama" submarket, as defined by plaintiffs, and had only a handful of sales in the North Alabama market.  PB & S had no business in South Alabama and the Florida Panhandle area, and won only three bids in North Alabama from 1984-1990.  It had a nonexistent market share from 1985 to 1990, the period of the purported conspiracy.  PB & S was not a player in

32

> sales to municipalities. Plaintiffs have produced no evidence that PB & S was motivated to, participated in, or benefited from a conspiracy.

Harcros, 877 F. Supp. at 1535. The record reflects that Van Waters also had a zero or near-zero market share in Alabama during the period of the alleged conspiracy. See id. at 1527-28. As the district court pointed out, Van Waters' and PB & S' participation in a conspiracy that garnered them zero or near-zero market shares would be irrational. The plaintiffs and their experts assert that Van Waters and PB & S participated in the alleged conspiracy because they were afforded a quid pro quo; these two companies, the plaintiffs assert, were allotted extra chlorine contracts in markets outside Alabama in exchange for their participation in the collusive behavior in Alabama. The plaintiffs have put forward no evidence, however, to show any such quid pro quo or even to show that Van Waters' and PB & S' market shares increased elsewhere. The appellants' case against Van Waters and PB & S thus amounts to an allegation that those two defendants took part in a conspiracy that earned them zero market share and zero dollars. There is no direct evidence against these two, and the circumstantial evidence, including the plaintiffs' expert testimony, does not support the conclusion that Van Waters and PB & S participated in a conspiracy that excluded them from the market. No trier of fact could find against Van Waters

33

and PB & S on such a basis.[29]  The entry of summary judgment in favor of Van Waters and PB & S on the plaintiffs' antitrust claims is therefore affirmed.


3.

We now turn to the plaintiffs' antitrust claims against Industrial and Harcros.  The documentary circumstantial evidence proffered by the plaintiffs is not alone sufficient to take Industrial or Harcros to trial because none of the documentary evidence supports the inference that the defendants colluded to fix prices in the Alabama repackaged chlorine market.  The Caine affidavit, for instance, says nothing about Industrial's motivation in passing on the Mobile contract.  Industrial argues that it withdrew its bid to avoid conflict with its supplier, Jones Chemicals, and Caine's affidavit would not enable a trier of fact reasonably to reject Industrial's contention and accept that of the plaintiffs.  Likewise, memoranda showing that Joe Ragusa exercised strict control over chlorine pricing at Harcros support an inference that Ragusa was frustrated with his subordinates' failure to follow an innocuous allocation of responsibility as easily as they support an inference that Harcros centralized pricing authority in Ragusa in order

---

[29] See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) ("It follows from these settled principles that if the factual context renders [plaintiffs'] claim implausible – if the claim is one that simply makes no economic sense – [plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary."); Eastman Kodak Co. v. Image Technical Svcs., Inc., 504 U.S. 451, 468-69, 112 S. Ct. 2072, 2083, 119 L. Ed. 2d 265 (1992) ("Matsushita demands only that the nonmoving party's inferences be reasonable in order to reach the jury . . . .  If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted."); Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc., 818 F.2d 1530, 1534 (11th Cir. 1987) ("Matsushita dictates that if the alleged conspiracy is economically infeasible or irrational then, as a matter of law, summary judgment must be entered against the plaintiff.").

to conceal the alleged conspiracy from other employees. Like these memoranda and the Caine documents, the rest of the plaintiffs' circumstantial documentary evidence is in equipoise, and in the absence of further evidence of collusion, summary judgment against the plaintiffs would be in order. See James v. Otis Elevator Co., 854 F.2d 429, 432 n.3 (11th Cir. 1988) ("A fact that can only be decided by a coin toss has not been proven by a preponderance of the evidence, and cannot be submitted to the jury."); Pan-Islamic Trade Corp. v. Exxon Corp., 632 F.2d 539, 558 (5th Cir. 1980) (requiring that circumstantial evidence "support an inference of the existence of an agreement" in order for claim of unlawful boycott to survive summary judgment).[30]

Viewing the plaintiffs' experts' proffered data and testimony in addition to the documentary evidence, however, we conclude that the plaintiffs' circumstantial evidence is sufficient to take their antitrust claims against Harcros and Industrial to trial. It is settled law that a threshold requirement of every antitrust conspiracy claim, whether brought under section 1 or section 2 of the Sherman Act, is "an agreement to restrain trade. To prove that such an agreement exists between two or more persons, a plaintiff must demonstrate 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1573 (11th Cir. 1991) (quoting American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S. Ct. 1125, 1139, 90 L. Ed. 1575 (1946)). "We recognize that it is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior

---

[30] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

of the alleged conspirators," Seagood, 924 F.2d at 1573-74,[31] and from other circumstantial

evidence (economic and otherwise), such as barriers to entry and other market conditions. When

a plaintiff seeks to prove a conspiracy by inference, courts must be mindful that

> "[o]n summary judgment the inferences to be drawn from the underlying facts . . .
> must be viewed in the light most favorable to the party opposing the motion."
> United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d
> 176 (1962). But antitrust law limits the range of permissible inferences from
> ambiguous evidence in a § 1 case. Thus, in Monsanto Co. v. Spray-Rite Service
> Corp., 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984), we held that
> conduct as consistent with permissible competition as with illegal conspiracy does
> not, standing alone, support an inference of antitrust conspiracy. Id., at 764, 104
> S. Ct., at 1470. See also [First National Bank of Ariz. v. Cities Serv. Co., 391
> U.S. 253, 280, 88 S. Ct. 1575, 1588, 20 L. Ed. 2d 569 (1968)]. To survive a
> motion for summary judgment or for a directed verdict, a plaintiff seeking
> damages for a violation of § 1 must present evidence "that tends to exclude the
> possibility" that the alleged conspirators acted independently. 465 U.S., at 764,
> 104 S. Ct., at 1471. [Such plaintiffs], in other words, must show that the
> inference of conspiracy is reasonable in light of the competing inferences of
> independent action or collusive action that could not have harmed respondents.
> See Cities Service, supra, 391 U.S., at 280, 88 S. Ct., at 1588.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356-

57, 89 L. Ed. 2d 538 (1986). This circuit applies these observations to section 2 conspiracy

claims as well. See Seagood, 924 F.2d at 1573-74.

A specific standard has developed for application to cases, such as the instant case, in

which the defendant oligopolists[32] assert that evidence seeming to indicate collusion in fact

---

[31] See also DeLong Equip. Co. v. Washington Mills Abrasive Co., 887 F.2d 1499, 1515 (11th Cir.1989).

[32] The parties agree that the market for repackaged chlorine in Alabama is oligopolistic. See Harcros, 877 F. Supp. at 1509. An oligopolistic market may be defined as a market in which "the dominant participants . . . engag[e] in interdependent or parallel behavior and [have] the capacity effectively to determine price and total output of goods or services." Republic of Tex. Corp. v. Board of Governors of the Fed. Reserve Sys., 649 F.2d 1026, 1044 & n.32 (5th Cir. Unit A June 1981) (quoting United States v. Marine Bancorporation, 418 U.S. 602, 630, 94 S. Ct.

reflects only a pattern of uniform business conduct known as "conscious parallelism." The Supreme Court has defined conscious parallelism as a "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S. Ct. 2578, 2590, 125 L. Ed. 2d 168 (1993). In other words, conscious parallelism is the practice of interdependent pricing in an oligopolistic market by competitor firms that realize that attempts to cut prices usually reduce revenue without increasing any firm's market share, but that simple price leadership in such a market can readily increase all competitors' revenues. See Coleman v. Cannon Oil Co., 849 F. Supp. 1458, 1467 (M.D. Ala. 1993) (quoting VI Phillip E. Areeda et al., Antitrust Law ¶ 1410b (1986)); VI Areeda, supra, ¶ 1429a-b.

"[I]t is well settled in this circuit that evidence of conscious parallelism [alone] does not permit an inference of conspiracy unless the plaintiff [either] establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic

2856, 2874, 41 L. Ed. 2d 978 (1974)).

self-interest,"[33] <u>Todorov v. DCH Healthcare Auth.</u>, 921 F.2d 1438, 1456 n.30 (11th Cir. 1991),[34] or offers other "plus factors" tending to establish that the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade.  See <u>Dunnivant v. Bi-State Auto Parts</u>, 851 F.2d 1575, 1583 (11th Cir. 1988);[35] <u>Gainesville Utils. Dep't v. Fla. Power & Light Co.</u>, 573 F.2d 292, 300-

---

[33] For the sake of clarity, we read this reference to a defendant's "economic self-interest" as a reference to what that defendant's legitimate economic self-interest would be under the assumption that it acted alone; a price-fixing conspiracy, if successfully implemented, is in the collective self-interest of the conspirators.  <u>Cf</u>. <u>Bolt v. Halifax Hosp. Med. Ctr.</u>, 891 F.2d 810, 826-27 (11th Cir. 1990) ("[T]he plaintiff must establish that each defendant would have acted unreasonably in a business sense if it had engaged in the challenged conduct unless that defendant had received assurances from the other defendants that they would take the same action."); ABA Section of Antitrust Law, <u>Antitrust Law Developments</u> 10 & n.51 (4th ed. 1997).

[34] The second sentence of note 30 in <u>Todorov</u> reads: "Conscious parallelism is uniform business conduct by competitors that permits a court to infer the existence of a conspiracy between these competitors."  We read this, in accordance with the remainder of that footnote and with the established law and scholarship on the point, to state only the first part of the test; that is, consciously parallel behavior permits a court to infer the existence of a conspiracy only in the presence of "plus factors," such as the implausibility that the defendants would have acted as they did had they not been unlawfully conspiring in restraint of trade.

[35] The district court read <u>Dunnivant</u> to require plaintiffs to show that the defendants' actions were contrary to their legitimate economic self-interest, <u>in addition to</u> showing "plus factors" that tend to exclude the possibility that the defendants were merely practicing conscious parallelism.  <u>See</u> <u>Harcros</u>, 877 F. Supp. at 1522-23.  There is support for such a reading in the wording of <u>Dunnivant</u>.  As explained in the text, however, we read <u>Dunnivant</u>, in accordance with the bulk of the law on point and with eminent scholarship, to establish only that the plaintiff either must prove that the defendants' actions were contrary to their legitimate economic self-interest or must show other "plus factors" tending to exclude the possibility of lawful action.  <u>See</u> <u>Gainesville Utils.</u>, 573 F.2d at 300-02; VI Areeda, <u>Antitrust Law</u> ¶ 1434, at 213-221 (noting on p. 213 that, "[w]ith rare exception, the courts have been very clear that mere parallelism, including interdependent conscious parallelism[,] cannot support a conspiracy finding unless there are additional or 'plus' factors."); ABA, <u>Antitrust Law Developments</u> 8-14.  In other words, whether the defendants' actions were contrary to their legitimate economic self-interest is only one prominent "plus factor" that plaintiffs may attempt to prove.

Our review of this circuit's law on point did disclose the following statement from <u>Bolt v. Halifax Hosp. Med. Ctr.</u>, 891 F.2d 810, 826 (11th Cir. 1990): "The rule in this circuit is that evidence of conscious parallelism does not permit an inference of conspiracy unless the plaintiff

38

02 (5th Cir. 1978); Donald F. Turner, The Definition of Agreement Under the Sherman Act: 'Conscious Parallelism' and Refusals to Deal, 75 Harv. L. Rev. 655, 659 (1962) ("Even the fact that competitors have knowingly charged identical prices is a neutral fact in the absence of evidence which would lead one to expect that the prices would have been different if truly independent decisions had been made.").  The requirement of "plus factors" is necessary because evidence of consciously parallel behavior alone leaves the circumstantial evidence of collusion in equipoise; consciously parallel behavior by oligopolists does not in itself support an inference of agreement, of "a meeting of the minds," any more strongly than it supports an inference of

_____

establishes that each defendant engaging in the parallel action acted contrary to its economic self-interest."  As explained in the preceding paragraph, a showing that the defendant acted contrary to its legitimate economic self-interest, see supra note 33, is sufficient to satisfy the requirement that the plaintiff show "plus factors" beyond mere consciously parallel action. Other "plus factors," however, may also exist.

On a different note, we observe that the district court cited our decision in Helicopter Support Systems., Inc. v. Hughes Helicopter, Inc., 818 F.2d 1530, 1534 & n.4 (11th Cir. 1987), as support for its addition of another prong to the established test for finding an agreement to restrain trade: that the plaintiff is required to "exclud[e] the possibility of independent action on the part of the defendants."  See Harcros, 877 F. Supp. at 1532.  This citation was erroneous for two reasons.  First, the language that the district court relied upon was addressed to plaintiffs who bring distributor-termination claims; that type of claim was not brought in this case.  See Helicopter Support, 818 F.2d at 1534 ("[T]he plaintiff in a distributor-termination case must also be able to point to evidence which tends to exclude the possibility that the manufacturer was operating independently in making his determination to terminate the distributor.").  In addition, the Helicopter Support language merely restated Matsushita's requirement (drawn from Monsanto) that the plaintiff show that an inference of conspiracy is reasonable, i.e., that the plaintiff allege a plausible conspiracy that is sufficiently supported by the circumstantial evidence.  See Helicopter Support, 818 F.2d at 1533 (after noting that evidence excluding independent action is required by Monsanto, we stated that, "[i]n short, Monsanto establishes that conduct which is as equally consistent with permissible competition as it is with an illegal conspiracy does not, without more, support even an inference of conspiracy.").  Helicopter Support, therefore, does not provide a basis for grafting an additional requirement onto the established test.

39

legal price maintenance or leadership. Thus, this requirement "ensures that unilateral or procompetitive conduct is not punished or deterred." Todorov, 921 F.2d at 1456 n.30.

The circumstantial evidence in the instant case – that is, the documentary evidence and the plaintiffs' experts' data and testimony – will thus be sufficient to take the price-fixing claims against Harcros and Industrial to trial if it meets the above standard. In sum, the plaintiffs first must produce evidence showing that the defendants engaged in consciously parallel action. Second, the plaintiffs must show "plus factors" that tend to exclude the possibility that the defendants merely were engaged in lawful conscious parallelism. One prominent "plus factor," to which antitrust plaintiffs often take recourse, is a showing that the defendants' behavior would not be reasonable or explicable (i.e. not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade – that is, that the defendants would not have acted as they did had they not been conspiring in restraint of trade. See, e.g., Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540-42, 74 S. Ct. 257, 259-60, 98 L.Ed 273 (1954).

We hold that the circumstantial evidence adduced by the plaintiffs against Harcros and Industrial satisfies this standard. For all the inadequacies of the record on appeal, it suffers from no shortage of evidence of consciously parallel behavior in the market; most importantly, Garner and McClave's data and testimony reveal that prices in the market moved in a notably parallel fashion during the period of the alleged conspiracy, and that prices uniformly rose during that period much more quickly than the defendants' costs. In addition, the fact that the chlorine-buying municipalities publicly announced the bid submitted by each competitor constitutes evidence that these defendants were conscious of each other's prices during this period.

40

The necessary "plus factor" is established by the high and rising incumbency rates demonstrated by McClave's data;[36] these rates peaked at over 90 percent during the middle of the period of the alleged conspiracy in the southern Alabama submarket, and at nearly 90 percent in the northern submarket, during a period of stable costs, high and rising prices, and high and rising profits.[37] Oligopolists behaving in a legal, consciously parallel fashion could achieve high and rising prices, even as costs remained stable, by engaging in price leadership. See VI Areeda, Antitrust Law ¶ 1429, at 176. The odds that they could achieve a price and profit increase and maintain incredibly high incumbency rates – that is, maintain the very same distribution of municipal contracts year after year – are minuscule, however, unless the oligopolists were communicating with one another.[38] In sum, this combination of high profits and high

----

[36] Cf. Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1245 (3d Cir.), cert. denied sub nom. Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc., 510 U.S. 994, 114 S. Ct. 554, 126 L. Ed. 2d 455 (1993) (in finding that defendants' refusal to bid on existing accounts as aggressively as new accounts constituted a plus factor, the court stated: "absent an agreement it does not make economic sense for defendants not to bid on an account, unless they have some problem like capacity or they know that the existing price is too high."); id. at 1246 ("It is one thing for competitors all to charge the same price, as a perfectly competitive market could lead them to do so. It is quite another for competitors all to refrain from soliciting each other's accounts."); VI Areeda, Antitrust Law ¶¶ 1420d & 1420' (1986 & Supp. 1997).

[37] The plaintiffs also point to other evidence that, they assert, supports the existence of two additional "plus factors": delivered pricing (i.e., pricing that includes all transportation costs) and departure from the business practices that prevailed before the period of the alleged conspiracy. (The remainder of the plaintiffs' asserted "plus factors" are certainly no more supportive of an inference of collusion than of an inference of conscious parallelism.) We do not consider whether delivered pricing and departure from previous business practices do in fact establish "plus factors" in this case, however, because our conclusion regarding incumbency rates in the market suffices to support the holding we reach today.

[38] Defendant Van Waters astutely points out in its brief that, if the defendants had wished to conspire, it would have been smarter to "rotate incumbencies," i.e., to alter the distribution of contracts from time to time in order to minimize incumbency rates and prevent a holding such as the one we reach today. We agree (although we also point out that such an arrangement likely

41

incumbency would not be likely to occur if the defendants[39] either were vigorously competing with each other or were engaging in competitive price leadership. It would be permissible for a jury to find, therefore, that the defendants were not in fact competing for contracts but were concertedly protecting each others' incumbencies and pushing up prices.

We therefore conclude that the circumstantial evidence produced by the plaintiffs establishes Harcros' and Industrial's consciously parallel behavior in the market for chlorine in Alabama. We further conclude that the evidence of very high incumbency rates in the market during the period of the alleged conspiracy, at a time of high and rising prices and profits but stable costs, establishes the necessary "plus factor" tending to exclude the possibility that the defendants were merely engaging in conscious parallelism. We therefore reverse the district court's entry of summary judgment in favor of Industrial and Harcros on the plaintiffs' antitrust claims.

B.

Finally, we review the district court's entry of summary judgment on the plaintiffs' fraud claims. The plaintiffs brought two types of fraud claims against the defendants. First, the plaintiffs claimed that the defendants committed fraud by sending to the municipal authorities

---

would have required more explicit, and hence more dangerous, collusion); nonetheless, the high incumbency rates exhibited in the market would not likely have occurred in the absence of some sort of communication among the defendants. Those rates therefore establish the necessary "plus factor."

[39] In this part of the opinion we review the district court's entry of summary judgment on the antitrust claims against Harcros and Industrial. As stated in part III.A.1, however, this discussion applies to Jones Chemicals as well.

letters apologizing for price increases and claiming that all price increases were the result of increasing costs.[40] Second, the plaintiffs asserted that the defendants committed fraud by signing bid documents that included clauses in which the defendants represented to the plaintiff municipalities that the bids being submitted were not the result of collusive behavior.[41] The district court tersely rejected the plaintiffs' fraud claims: "Having ruled there is no conspiracy, the court finds there can be no fraud for failure to disclose it." Harcros, 877 F. Supp. at 1537. We first note that this finding is an insufficient ground for granting summary judgment on the claims that arise out of the price increase letters; those claims do not depend upon the existence of a conspiracy because the plaintiffs could potentially prove that the representations made – that price increases were due to cost increases – were false without also proving that the defendants conspired to bring about the referenced price increases by collusive behavior. We therefore vacate the district court's entry of summary judgment as to the fraud claims based on the defendants' letters. We remand for a determination of which claims are supported by evidence of representations by specific defendants to specific plaintiffs. The claims that are supported by the record must go to trial.

---

[40] One such letter, from Jones Chemicals, read:

Although it in no way reflects the wishes of Jones Chemicals, we find it necessary to adjust our selling prices from time to time in order to keep up with the ever increasing cost of staying in business as a reliable source of chemicals.

[41] One such clause, included in a bid document executed by Harcros for the benefit of the City of Lafayette, stated:

I hereby affirm I have not been in any agreement or collusion among bidders or prospective bidders in restraint of freedom of competition, by agreement to bid at a fixed price or to refrain from bidding, or otherwise.

Furthermore, because we hold that the plaintiffs' antitrust claims against Harcros, Industrial, and Jones survive summary judgment, we vacate the district court's entry of summary judgment as to all of the plaintiffs' fraud claims with support in the record that are based upon these three defendants' alleged concealment of a price-fixing conspiracy.[42] We remand for the district court to determine which of these defendants submitted bid documents containing the allegedly false representations to which plaintiffs, and thus which fraud claims of this second type should go to trial.[43]

## IV.

For the foregoing reasons, we REVERSE the district court's exclusion of the testimony of Loraine and Peter Cassassa, REVERSE the district court's exclusion of the affidavit of O. W. Caine, and AFFIRM the district court's exclusion of the testimony of Barbara Krysti. We

---

[42] Because we affirm the district court's entry of summary judgment on the antitrust claims against Van Waters & Rogers and PB & S, we also affirm its entry of summary judgment on the plaintiffs' claim that these two defendants made fraudulent representations of non-collusion in bid documents.

[43] In its order granting summary judgment, the district court also held that the defendants' fraud, if it occurred, was excused by the lack of a "confidential relationship with the plaintiffs requiring disclosure of the existence of a conspiracy." Harcros, 877 F. Supp. at 1537. The court cited Lowder Realty, Inc. v. Odom, 495 So. 2d 23, 26 (Ala. 1986); Holdbrooks v. Central Bank of Ala., N.A., 435 So. 2d 1250, 1252 (Ala. 1983); and Tonsmeire v. Tonsmeire, 233 So. 2d 465, 468 (Ala. 1970), in support of this proposition. These cases, and the doctrine they reflect, require that a close relationship exist between two parties before there arises a duty to disclose – that is, not to remain silent – about facts material to the relationship. See id. In the instant case, however, the plaintiffs allege not that the defendants merely failed to speak up about the alleged conspiracy, but that the defendants made affirmative and explicit misrepresentations to them regarding the existence of the conspiracy and the defendants' costs. These cases, and the doctrine underlying them, are therefore inapposite.

44

REVERSE in part the district court's exclusion of the data and testimony of Perry Garner and James McClave, and AFFIRM in part. On the basis of the evidence as it appears now that the admissibility questions are settled, we REVERSE the district court's entry of summary judgment on the plaintiffs' antitrust claims against Jones Chemicals, Harcros, and Industrial. We AFFIRM the district court's entry of summary judgment on the plaintiffs' antitrust claims against Van Waters and against PB & S. Finally, we AFFIRM the district court's entry of summary judgment on the plaintiffs' claim that Van Waters and PB & S made fraudulent representations of non-collusion in bid documents. In all other respects, we VACATE the district court's entry of summary judgment on the plaintiffs' fraud claims against the defendants and REMAND for further proceedings in accordance with this opinion.

SO ORDERED.